Thank you. Good afternoon. My name is Reynold Finnegan. I represent the Parunakyan family. It's an asylum claim. I believe there's two main issues. One is the one-year issue, whether the asylum was filed timely within one year. Speak a little louder, please. Yeah, right into the microphone. It kind of drowns out. Okay. So on the one-year issue, petitioners are relying on the Taslima case. In that matter, a seven-month delay was found reasonable under the circumstances. In the present matter, the asylum was filed eight months after their status expired or four and a half months since their last attempt at an extension was withdrawn. So the four and a half months is less than the seven months in Taslima case. So hopefully the court will see it that this is a reasonable time period. If the court does see that, then hopefully we can get a remand to reconsider the asylum claim as the immigration judge and the BIA both found petitioners not eligible for the asylum because of the one-year issue. There's also a significant credibility issue. Most of the discrepancy... Well, just because you get to file it doesn't mean you win right there. You still have to get over the adverse credibility, right? Correct. Okay. Correct. Credibility, the BIA kind of looks like they limited it to three or four main instances that they relied on, but one of them was explained by the petitioner in the record at page 203 about the difference between a central district office for the political party and the main central office in the capital city of Yerevan. With that explanation, I believe that there really is no discrepancy to speak of. Well, okay. There's several that are listed, right? And you're pre-real ID, correct? Correct. So we're looking at the pre-real ID standard, and so they need one consistency that goes to the heart, correct? Correct. Correct, Your Honor. And you're right. So this pre-real ID act, it's a different standard. And we'll also note this. One of the main discrepancies that was perceived was how long the lead petitioner stayed in the hospital, and it was four days versus seven days. I went through the transcript. The petitioner actually testified one week on several occasions, and then he testified four days on a different occasion. So the page numbers, page 237 and 239, he mentions one week's stay in the hospital. Page 201, he mentions four days. But the courts really latched on to the discrepancy between the four and the seven. Meanwhile, he did testify seven days on a couple other occasions, so it looks like a little confusion. But the point being, I don't think this alone is enough to support an adverse credibility finding. Also, one other key point is the interpreter had a problem interpreting the medical certificate live in the court. And that was pages 315 and 318 of the record. He states he's unable to interpret one of the terms, the medical terms, and the court relies on this as a discrepancy, his testimony versus the medical certificate. And I believe because of this inability to translate of the interpreter, the court should have relied on that version. Kagan. Did you raise translation as an issue on appeal? No, not on that particular point. What about, Mr. Finnegan, the issues of, for instance, the petitioner claimed that he wrote some news articles, right? And he just couldn't say a word about what they were about. And then he talked about, you know, writing speeches on behalf of the candidate. And, you know, he couldn't tell what the speeches were. I mean, aren't those the kinds of credibility issues that go to the heart of the claim? Those issues are... The speeches were also opposition speeches, not just speeches. Right, right. So they would be material. I agree with you there. But a failure to remember or explain I don't think is grounds for an adverse credibility finding. Maybe it's grounds for insufficiency of evidence, but I don't think it should have supported an adverse credibility finding under pre-real ID law. Well, also, but some of these, he were, you know, he's saying that he's proselytizing to the youth about certain things that are part of the problem of why he was, you know, why he was targeted and why he would continue to be targeted. Don't you have to know what some of those things are about? Yeah, but I would agree to you. I mean, it's like if I'm saying I'm a communist, but then you ask me, what's a communist? And I said, well, I don't know. Would that give you very much confidence in the fact that I was a communist? No, Your Honor. I agree with you a hundred percent that that wouldn't give me confidence. But I think we're arguing what the BIA relied upon, and I don't think that they relied on that. All right. So if you get my explanation. But if you get by these credibility issues, what you want is a remand, right? Correct. Now, on the remand, well, it'll be the same claim, right? I mean, you want the remand on the asylum issue. Correct. Correct. We're always looking at collateral forms of relief, though, once the case goes back. Well, but the asylum is the heart of the claim. But it would be for asylum, correct. All right. Well, let me ask you this, because I get this clear in my mind. Now, the IJ discredited your client, Barakunian, for referring to some notes during his oral testimony. Is that right? Yes. Speak up. Yes, Your Honor. That's right. Okay. And when he testified, he spoke in Armenian, which is his native tongue, in the presence of an official interpreter. And when he testified, his notes were there for all to see. He had the notes in front of him. They were written in Armenian. Right. That's what the judge indicated. Were you his lawyer at the time? No, I did not represent him in the trial court. All right. And once the notes were taken away, his testimony continued and was substantially consistent with his written statement. All right? I agree. I agree. All right. And that statement was part of his original application. Yes, Your Honor. Yes. Except for a few mainly trivial differences. Right. All right. Then the I.J. highlighted inconsistencies between his written statement and his oral testimony regarding where he was on March the 16th, 1998, before a traumatic beating occurred. And in his narrative statement, he mentioned Dimrichian as the central headquarters, and he testified that Dimrichian's headquarters were in Yerevan. But he later testified that he was at a polling place in the district of Kotanik on March the 16th. Yes, Your Honor. I understand. Okay. Now, when he was confronted with the inconsistency, I believe he explained that every district in Armenia has a central headquarters. So central headquarters in his written statement meant the central headquarters for the Kotayak district. Correct. Correct. And the I.J. believed his explanation was contrived. That's my understanding. Yeah. And this discrepancy, the way I look at it, is based on phrasing. And it seems to me that that's trivial and doesn't relate to his fear of anything about fear for his safety. I would agree, Your Honor. Is that the gist of your argument? Yes, Your Honor. I would agree. Yes. All right. Thank you. Okay. Thank you. All right. We've taken you over time, but I will give you a minute for rebuttal. Okay. Thank you, Judge. Thank you. Good afternoon. Good afternoon, and may it please the Court. One of the motivations. Can we have your name? Sorry? Can we have your name for the record? Oh, I'm sorry. I'm Mark Walters, representing the Attorney General. Okay. Thank you. One of the driving forces when someone's going to fabricate an asylum application is they need to make themselves look like a likely target. So you didn't just go to the speech, you gave the speech, but you can't remember it. You didn't just support Demerchian's youth agenda. You actually went out to universities and spoke to people about it, but you can't remember anything about the youth agenda. You weren't just at a polling station. You were at Demerchian's central headquarters, and in the statement he says, this is where all the calls came in from, from around the country, the other polling places. That's what the central headquarters was. Now, in his testimony, he said, I was at Abovian, and he attempted to correct that by saying every district has a central headquarters, but the calls don't all come in to all the district headquarters. They come in through the Yerevan office. So that explanation simply didn't work. The notes that he was looking at, he said, these are my notes. It was actually his written statement in Armenian. So it wasn't just notes. He had his statement in front of him in Armenian while he was being questioned about it. He says he was hospitalized, sometimes for four days, sometimes for a week, and on page 237 he says more than a week. The certificate that he produced, one of the few things he produced to corroborate his story, there was a certificate of hospitalization. He claims it was given to him when he was discharged. His testimony was that it was when he was discharged, but then the date was much later, right? Years later? The certificate that he claims he got was in 2003, and the hospitalization was in 1998. So that's not possible. In addition, he testified that he had bruises. How many years elapsed between when he was in the hospital until his case came before the IJ? I think the first hearing was in, it was in an 07, or 07, and then actually I have that somewhere. The hearing began in 07, and then the two key ones were about eight months apart in 2010. The IJ stopped the first one because he had reported when he was being cross-examined for a while and things weren't going well, he said, I was in an accident recently. And so the IJ said, well, if you think that's affecting your memory, we will adjourn the hearing, and they reconvened six months later in September of 2010. So there were three hearings altogether, but this certificate was issued five, dated five years after he claims to have received it. In addition, he says in his testimony- That's something he got from the hospital. Yes. Well, we don't know where he got it, Your Honor, I'm sorry. We don't know where he got it. But he claims he got it upon discharge in 1998. That doesn't make much sense given the date on it. The other thing that doesn't make sense about it is- The inconsistency that the court was focusing on is he said he got a certificate when he got out of the hospital. Yes. Right, and that was in the 90s. And then he presented a certificate that he said corroborated that, and that was stated five years later. Yes. Well, if it corroborates that, he contacted the hospital or had somebody do it. Probably, Your Honor. I can't answer that, but that makes sense to me. Now, the other problem with it is that he testified that he had bruises from this beating, lots of bruises, and he even said he used lotion to treat it. The document itself said he had multiple fractures, and there's no lotion known to man that will deal with multiple fractures. So one of the other of those things is not true. This is really a clear-cut case on credibility of more than one part of the claim discrepancies, and since the line drawing is done by the agency, we submit respectfully that the court has to defer to that line drawing here because there is substantial evidence of incredibility. Is there like a presumptive tolling period that's reasonable? Well, the preamble to the regulation said that after six months it's presumptively unreasonable, but we'll deal with it on a case-by-case basis. They didn't bless everything under six months, but I think that the case law has looked favorably upon shorter than six months and unfavorably upon longer. Now, this is a case that's not real easy to classify whether it's a more or less than six months case, isn't it? Well, it becomes easy if you look at the regulation, Your Honor. The regulation doesn't say applied for status. It says maintained status. So in the list of exceptions, somebody who has maintained status does not have to file for asylum until that status is over. So you read the regulation saying then the time starts to run as soon as his visa expires. Yes, and at that point – In spite of his efforts to get it renewed. Yes, Your Honor. In spite of his efforts, at that point he needs to be doing two things at once, not waiting. He needs to be working up his asylum application and waiting for the decision on his visa extension. So you don't consider waiting until the visa route is exhausted as a reasonable action, just waiting instead of not doing something? No, Your Honor. I mean, if I was in his shoes, I would hope it was that way because I'd rather not have to work on something and maybe not need it. But on the other hand, you can see how this opens the door for abuse. If all you have to do is keep filing applications and not ever bring your day in court on the asylum claim, you can make that last a long time. And there is no support for that in the regulation or in agency decisions. And so, again, we think that the court should defer here. And I would point out on the Taslimi case, that's not a clear seven-month case because what the court found, unlike here, here we have a clear start of the clock. It's the day his visa expired and he's no longer maintaining status. The Taslimi case is a changed conditions case. There was a religious conversion involved, and the government argued that the clock started on the ceremony, the date of the ceremony of the conversion. And the court said, well, if you look at the record, she said she needed some time to figure out if this was the right path for her. And so the conversion is not an instantaneous thing that people really go through a process. And so in the Taslimi case, there were seven months from that ceremony until the asylum application was filed. But what the court is really saying is the obligation to go for the asylum application really didn't start until sometime later, unspecified date. And under the circumstances that date, the agency should have deemed reasonable. We don't have that here. Now, is the standard of review of the, I guess the BIA's determination that, you know, this case doesn't meet the requirements for equitable tolling, is that subject to the same substantial evidence standard as any other factual determination by the BIA? I have to say, Your Honor, I am not certain what we said in our brief on that. So I would say if I say anything inconsistent with our brief, the brief is correct. I think it is. It's a judgment call. And I know we have argued in the past, or I believe we've argued in the past, that this is a standardless thing. But I think the court has disagreed and said we can review this, that there are standards because the regulation, the preamble talks about what might be favorable. But at any rate, it doesn't start until you don't, you know, because he came here in the 90s, right? Yes. So while he could have, he still could have filed for asylum a year after he came in the 90s, right? Oh, yes. But you're not saying he was required to? Not required until February 2003 when his legal status was terminated, when it expired. I would also suggest, and I thought of this when you were talking to opposing counsel, I'm not sure the court needs to reach the one-year issue because if you uphold the credibility determination, what would be the point of remanding to consider the asylum claim? Asylum and withholding are coextensive. The only difference is the burden that is on the individual. And since somebody who's found incredible can't meet either burden. Well, but if it was barred, if it was barred by the one year, then that ends it, right? That does end it. All right. But then if we didn't bar it by the one year, then we have to look at the asylum and what withholding and the CAT. But asylum determines that. And if any one of the reasons is substantial evidence and goes to the heart of the claim, then the standard of review requires us to affirm or deny it. Yes, Your Honor. That's your argument? That's our argument. Okay. Have you read the country reports? I've read the ones in the record I think go up to about 2009 or so. I have one here from 1998. May I get my copy of the record, Your Honor? Oh, yeah, sure. Can I read along with you? Sure. What page would you be on, Your Honor? It looks like it might be the second page of the report. It's in the record there, 000324. Mine just fell open to that page. I'm with you, Your Honor. What? I'm with you. I'm on the same page. Oh, okay. So that would go to the next page. Here's what I have here. The Ministry of Internal Affairs and National Security is responsible for domestic security, intelligence activities, border control, and the National Police Force. Members of the security forces committed human rights abuses. Then you go down to the next paragraph. It starts with the words, the Constitution. The Constitution provides for broad human rights protections, but human rights problems persist in several important areas. Substantial intervention by local power structures in the March presidential election continued to restrict citizens' ability to change their government peacefully. Members of the security forces routinely beat detainees during arrest and interrogation, made arbitrary arrests and detentions without warrants, and did not respect constitutional protections regarding privacy and due process. Then it goes on. Prison conditions remain poor. The judiciary is subject to political pressure and does not enforce constitutional protections effectively. And it goes on. Well, Your Honor, we don't dispute any of that. And then you go to the next page, 000326. And this is what, under the heading in the middle of the page, of torture and other cruel, inhumane, or degrading treatment or punishment. The Constitution and laws prohibit torture. However, the practice of security personnel beating pretrial detainees during arrest and interrogation remains a routine part of criminal investigations. Most cases of police brutality go unreported. Prosecutors rely on confessions to secure convictions. That goes on. May I comment, Your Honor? There is a whole litany of them. Yeah, go ahead, comment. This is a 1998 country report prepared by the Department of State, and we don't quarrel with it, obviously. The problem is the burden, especially when you're coming from a country that has these kinds of difficulties, is that the applicant has to show that they're going to be singled out for persecution, not that the country is itself not a perfect or ideal place to reside. In this case, going to the very first thing you read, the Ministry of Internal Affairs and National Security is responsible for domestic security. There's even a problem as to this, because at one time the petitioner says he was taken to a police station, and another account of that same incident, he says he was taken to internal affairs. So we don't know what to believe. We don't know how he fits into this. We just know that he's made an effort to boost his profile up to where he would more likely be someone that his opponents would recognize and be interested in. But we submit that he doesn't succeed at that because he's incredible. All right. We've taken you over time. Thank you. Oh, I'm sorry. Did you have another question? No. I'm thinking about one. Well, it's all I can put my finger on at the moment. We're on the 2015 country report. I found the 2010. It talks about police employed torture and mistreatment to obtain confessions and reportedly beat and abused citizens during arrest and interrogation. The petitioner did testify that things have not changed. So when we read earlier from the 1998 country report, at least his view is that whatever the latest country report is, or the one prior to his hearing at least, that things have not gotten any better. What would you say? The petitioner believes things have not gotten any better since his 1998 experiences. So when we read from the 1998 country report, if the later ones, for example, 2010, still refer to problems, which they do, that's consistent with what we've heard at the hearing. Okay. Thank you. Thank you. Okay, we'll give you two minutes. One thing I noticed, I heard, is about the one-year issue. The standard is totality of the circumstances. So therefore, the fact petitioner filed an extension of his H-1B visa, it's a factor. It doesn't mean conclusively that he's told the time for that time period, but it is a factor. And it's important to note petitioner was on a three-year H-1B visa at the time he filed his extension request for another three-year time period. What was he doing? I'm not sure what his job was. He was a teacher in Armenia, right? But what was he doing here? In here for the H-1B? I'm not sure, Your Honor. Okay, that's fine. I couldn't find it either, so I just thought you might know. Yeah, no. But he's talked to them recently. He asked you a question. Have you talked to your client recently? Yeah, I speak mostly to the son, through the son, not through the lead petitioner. But I've spoken to the family. Did you say he was in this courtroom this morning? No, he's not here today. You said he's in front right here. No, he's not here today. The H-1B extension request was withdrawn by his prior employer, so the petitioner was not aware of that at the time the extension was placed, so therefore he has less incentive to file for the asylum at that point in time because he's probably under the belief that most likely his extension is going to be granted. It's already been in effect for three years, and he's been working for the company. Therefore, I think under the totality of circumstances, it's a strong factor as to why he didn't file the application for asylum until he did. Also, I would like to note the medical certificate did match his testimony on the issue of brain concussions, and that's what the respondent testified was a significant injury that he remembered being treated for in the hospital at that time. So the document does match his testimony on that issue. There was a discrepancy on bruises versus fractures. And also he did testify that he got the certificate when he left the hospital, and the date is five years later, right? Yeah, there is a discrepancy on when he received the document, yes, Your Honor. All right, thank you for your argument, both. This matter will stand submitted.
judges: Pregerson, Tashima, Callahan